**Dethorn GRAHAM, Plaintiff-Appellant,**

**v.**

**CITY OF CHARLOTTE; M.S. Connor; R.B. Townes; T. Rice; Hilda P. Matos; M.M. Chandler, Defendants-Appellees.**

No. 86–2163.

United States Court of Appeals, Fourth Circuit.

Argued April 6, 1987.

Decided Aug. 25, 1987.

of excessive force by officers of the Charlotte, North Carolina Police Department, appeals an order of the district court, 644 F.Supp. 246, granting a directed verdict in favor of the defendants. Although we find that the conduct of the police officers was far from commendable, we agree that no constitutional injury occurred. We, therefore, affirm.

## I.

On November 12, 1984, Graham was working on an automobile at his home in Charlotte, North Carolina, when he felt the onset of a diabetic insulin reaction. For a diabetic such as Graham a reaction caused by a drop in blood sugar can cause nausea, dizziness, and disorientation. Left untreated the reaction can lead to coma or even death.

When Graham noticed his insulin reaction, he asked a friend, William Berry, to drive him to a nearby convenience store. Graham intended to purchase orange juice, knowing that the sugar content would counteract the reaction. When he entered the store, however, Graham saw a number of people ahead of him at the counter. In an apparently agitated state, Graham ran or walked rapidly out of the store and asked Berry to drive him to his girlfriend's house.

During this time, officer M.S. Connor of the Charlotte Police Department had been sitting in his patrol car near the convenience store. Observing Graham's erratic behavior, Connor followed the car being driven by Berry and made an investigative stop approximately one-half mile from the store. As Connor approached the automobile, Berry informed him that Graham was having a "sugar reaction." Connor responded that Berry would have to wait until it was determined what, if anything, Graham had done at the convenience store. Connor then returned to his patrol car to summon backup assistance.

At this point, Graham, in the throes of the insulin reaction, exited Berry's automobile and ran around it twice. At Berry's request, Connor approached to assist Berry in catching and restraining Graham. When

Edward G. Connette (Gillespie, Lesesne & Connette, Charlotte, N.C., on brief), for plaintiff-appellant.

Frank Bayard Aycock, III, Charlotte, N.C., for defendants-appellees.

Before RUSSELL and HALL, Circuit Judges, and BUTZNER, Senior Circuit Judge.

K.K. HALL, Circuit Judge:

Dethorn Graham, the plaintiff in an action alleging the unconstitutional infliction

Connor and Berry approached, he sat down on the curb. Graham testified that he lost consciousness during that time and that when he awoke he was lying face down on the ground with his hands cuffed behind his back.

At different intervals, four other Charlotte police officers, R.B. Townes, Hilda Matos, M.M. Chandler, and T. Rice, arrived on the scene in response to Connor's request for backup. A crowd also began to gather from a nearby apartment complex. After the police officers determined that no crime had been committed at the convenience store, they decided to place Graham in a patrol car and transport him home.

Graham testified that he struggled with the officers because they would not allow him to reach his wallet and display a card identifying him as a diabetic. He also maintained that the officers refused to allow one of his friends to give him orange juice and that one of the officers cursed him when he asked for the juice. Graham further maintained that in the struggle, his face was slammed against the hood of the police car before he was then forcibly shoved into the car and driven home.

It is undisputed that at some point during the unfortunate incident Graham's foot was broken. Graham also contended that he suffered an abrasion over his left eye, that his wrists were cut by the handcuffs, that his right shoulder was injured and that he developed a loud ringing in his right ear as a result of being "slammed" onto the hood of the automobile.

Graham subsequently brought a civil action in district court on July 11, 1985, against the City of Charlotte and the five individual police officers present on November 12, 1984. In addition to alleging the infliction of constitutionally excessive force by the officers, Graham charged that the city had failed to train its police offi-

cers to respond appropriately to a medical emergency. He also alleged the officers' conduct amounted to discrimination on the basis of handicap in violation of § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 704. Finally, Graham asserted pendent state claims of assault, false imprisonment and intentional infliction of emotional distress under North Carolina common law.

The case came on for trial on September 16–17, 1986. In addition to his own account of the incident, Graham presented the testimony of William Berry and Officer Townes. Graham also sought to introduce expert testimony by Dr. Robert Meadows on the subject of proper police training.[1]

Following the presentation of plaintiff's case, all defendants moved for a directed verdict pursuant to Fed.R.Civ.P. 50. Upon consideration of the motions, the district court first concluded that a reasonable jury, viewing the evidence in the light most favorable to plaintiff, could not find that the infliction of force by the police officers was constitutionally excessive. The court also found that Graham's allegation of improper or inadequate police training by the City of Charlotte was refuted by the testimony of his own expert witness. Finally, the court rejected the claim of handicap discrimination based on § 504 of the Rehabilitation Act on the ground that the statute did not reach misconduct of the sort alleged by Graham. Accordingly, the district court granted all motions for a directed verdict as to all counts of the plaintiff's complaint.[2]

## II.

On appeal, Graham contends that the evidence presented was sufficient to raise a jury question as to whether the officers' use of force and refusal to provide medical care were constitutionally unreasonable.

---

1. Dr. Meadows, an experienced instructor in the field of criminal justice, was employed at Appalachian State University at the time of the trial. The court permitted Dr. Meadows to express an opinion regarding the appropriate level of police training. The court declined, however, to allow Meadows to offer an opinion concerning whether the officers acted in conformity with adequate training on November 12, 1984. In

this appeal, Graham contends that the court erred in restricting the opinion of his expert.

2. The district court's order made no specific reference to the pendent state claims. Graham suggests, however, that a directed verdict on "all counts" implied that a directed verdict was granted in those claims.

Graham further argues that the district court applied an incorrect legal standard when it assessed the evidence in support of his excessive force claim. Finally, Graham maintains that the district court committed reversible error in both the disposition of his state tort claims and the limitation imposed on Dr. Meadows' expert testimony. We see no merit in any of Graham's contentions.

■ As a threshold matter, we reject any suggestion that the district court erred in setting forth the correct standard for constitutionally excessive force. Citing the factors articulated in our decision in *King v. Blankenship,* 636 F.2d 70 (4th Cir.1980), the district court expressly considered:

(1) The need for the application for the force,

(2) The relationship between the need and the amount of the force that was used,

(3) The extent of the injury inflicted, and

(4) Whether the force was applied in a good faith effort to maintain and restore discipline or maliciously and sadistically for the very purpose of causing harm.

Graham argues, however, that subsequent decisions of this Court including *Carter v. Rogers,* 805 F.2d 1153 (4th Cir. 1986), *Justice v. Dennis,* 793 F.2d 573 (4th Cir.1986), and *Kidd v. O'Neil,* 774 F.2d 1252 (4th Cir.1985), have altered the *King* factors by abandoning consideration of whether the allegedly excessive force was "applied maliciously and sadistically for the very purpose of causing harm." Graham contends that excessive force is now measured on a totality of the circumstances that examines only the need for force, the amount of force used and the extent of any injury inflicted. Appellant's theory, however, is rooted in a substantial misreading of our previous decisions.

In *Kidd,* we rejected a lower court's determination that constitutionally excessive force turned solely upon whether the state actor had intentionally deprived a plaintiff of a specific constitutional right. Instead, we concluded that an excessive force claim required the court to "grapple" with both the degree of force applied and the factual context in which the force arose. *Kidd,* 774 F.2d at 1261. Far from rejecting consideration of the fourth *King* factor, we held that concepts such as "malicious and sadistic" should be understood as descriptions of the degrees of force that exceed the state's privilege, and, thereby, implicate intrusions into constitutionally protected "personal security." *Id.*[3]

In *Carter* and more specifically in *Justice,* we have confronted the question of how best to instruct the jury on the issue of excessive force. Our concern has been that the jury should examine all of the relevant circumstances when determining whether the use of force was constitutionally unreasonable and not focus exclusively on any one factor. While that issue has not at this juncture, been conclusively resolved[4], nothing that we ultimately decide with regard to proper jury instructions is likely to affect the propriety of the district court's balanced application of the four *King* factors when ruling on a motion for a directed verdict.

■ We conclude, therefore, that the district court did not use an erroneous legal standard when deciding whether Graham's

---

**3.** In *Kidd,* we recognized that the right to personal security may, depending upon the factual circumstances, involve rights protected by the fourth, fifth or eighth amendments. In the recent decision by the United States Supreme Court in *Whitley v. Albers,* 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986), the court concluded that an excessive force claim arising under the eighth amendment "ultimately turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" [Citations omitted] 106 S.Ct. at 1085.

Graham was, of course, not an incarcerated prisoner. His complaint of excessive force did not, therefore, arise under the eighth amendment. It is unreasonable, however, to suggest that a conceptual factor could be central to one type of excessive force claim but reversible error when merely considered by the court in another context.

**4.** The panel decision in *Justice* was vacated by a grant of *en banc* rehearing, 802 F.2d 1486 (4th Cir.1986). The opinion of the full court has not yet been announced.

case could withstand a motion for a directed verdict. The only question remaining is whether under that standard, a reasonable jury viewing the evidence in the light most favorable to the plaintiff could have found that Graham's constitutional right to personal security was violated by officers of the Charlotte police department, *e.g.*, *Wheatley v. Gladden*, 660 F.2d 1024 (4th Cir.1981). We agree with the district court that appellant's evidence could not support a verdict in his favor.

It is undisputed that on November 12, 1984, Officer Connor observed a man in a state of obvious agitation run into a convenience store, exit almost immediately, enter a car and drive rapidly away. Under those circumstances, reasonable suspicion would justify at least a brief investigative stop of that vehicle. Indeed, appellant has not contended in this appeal that the initial stop of Berry's automobile was improper.

Once the stop had occurred, Graham's illness induced behavior was so erratic that Berry was forced to seek the officer's assistance in restraining him. Graham suggests on appeal that he was sitting calmly when the additional police officers arrived and handcuffed him. Graham's trial testimony, however, was that he had no memory of what transpired between the time the car was stopped and the moment he regained consciousness lying on the ground. Although Berry initially testified that Graham was calm at that time, he conceded on cross-examination that in a statement to the police on November 26, 1984, he had stated that Graham was "having fits." Officer Townes, the first backup officer on the scene, was called as plaintiff's witness and testified that when he arrived, Graham was lying on the ground and kicking backwards toward Officer Connor. Finally, appellant's own expert witness, Dr. Meadows, opined that under the circumstances it was appropriate to subdue and handcuff him. Clearly Graham's own evidence fails to demonstrate either unnecessary or excessive force at this juncture.

We likewise see nothing in the evidence below to suggest that the bounds of constitutionally impermissible behavior were crossed by the subsequent efforts of the officers to remove Graham from the scene.

Townes testified that the crowd that had gathered was becoming unruly. In light of that uncontested testimony, the district court's conclusion that removing Graham was an expedient method of avoiding further confrontation is eminently reasonable.

There is no question from the available record that Graham physically resisted the effort to place him in the police car. Sadly, there is also no question that in the course of that resistance, he sustained a broken foot. Nevertheless, there was no testimony from which a reasonable juror could infer that any officer struck Graham or in any way inflicted that injury. Indeed, the available evidence strongly suggests that the injury was both accidental and self-inflicted.

Graham also alleged that the officers "slammed" his head into the hood of an automobile thereby causing an injury that manifested itself as a continuous ringing in his right ear. Berry, however, testified that while he saw the officers push appellant's head down during the struggle, he heard no impact with the car. Moreover, appellant presented no medical evidence to support his allegation of head injury.

Finally, we agree with the district court that there is no evidence that the officers denied appellant medical treatment. Indeed, the uncontested testimony of Officer Townes was that Graham was twice asked whether he wanted medical assistance. Townes further testified that Graham declined the offer, both at the scene of the stop and at the time he was transported to his home.

Appellant's unfortunate encounter with the Charlotte Police Department on November 12, 1984, was a lamentable occurrence. It is deeply regrettable that a private citizen who had committed no crime was forcibly taken into custody and suffered injury as a result. Nevertheless, the evidence clearly indicates that at each stage of the incident, the actions of the officers were essentially reasonable under the circumstances.

As the district court soundly noted, not every push or shove by a state actor can rise to the level of a violation of constitu-

tional rights. It may be fairly debated whether the officers of the Charlotte Police Department behaved wisely on November 12, 1984. We are convinced, however, that a reasonable jury weighing the evidence presented below in accordance with legal standards in this Circuit, could not find that the force applied was constitutionally excessive.[5] We, therefore, agree with the district court's decision to grant a directed verdict in favor of the defendants.

## III.

■ Appellant's remaining contentions need not detain us long. With regard to the pendent state claims, we see no indication that the district court actually addressed them in its order granting a directed verdict. Pendent jurisdiction over state claims in federal court is a matter of judicial discretion. *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). In light of the thorough and explicit disposition of all of Graham's federal claims, we conclude that the district court's silence on the pendent claims indicates that those claims were dismissed without prejudice to appellant's right to pursue them in state court. We can see no abuse of discretion in that decision.

We likewise see no merit in Graham's claim that the district court erred in restricting the testimony of his expert witness. The testimony which the district court barred related to whether the officers present on November 14, 1984, acted in accordance with proper training. Even were we to conclude that the district court's action somehow exceeded its broad discretion in determining evidentiary admissibility, there would still be no reason to disturb the decision below. Dr. Meadows' proffered testimony was relevant only to Graham's claim that the City of Charlotte had failed to train its police officers adequately. Graham has not, however, appealed the dismissal of his claim against the City. With regard to the issues remaining on appeal, the limitation of Dr. Meadows' testimony has no significance.

## IV.

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED.

BUTZNER, Senior Circuit Judge, dissenting:

## I

Affirmance of the district court's grant of a directed verdict rests on the faulty premise that Graham's rights and the conduct of the police are measured by a standard fashioned to implement the eighth amendment's prohibition against cruel and unusual punishment. It was error to require Graham to prove, in the words of *King v. Blankenship,* 636 F.2d 70, 73 (4th Cir.1980), that the police acted "maliciously and sadistically for the very purpose of causing harm." *King* dealt with a convict's claim against his guard for cruel and unusual punishment in violation of the eighth amendment. To establish such a violation, a convict must prove "unnecessary and wanton infliction of pain." *Whitley v. Albers,* 475 U.S. 312, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986). But Graham was not a convict. He was not even a pretrial detainee or a person under arrest. He was a free, innocent citizen, a man who had a responsible job with the North Carolina Department of Transportation. Unfortunately, he suffered from diabetes and occasional insulin reactions.

The Supreme Court has never even hinted that a person in Graham's situation should be subjected to the rigorous standards of the eighth amendment in order to recover damages for injuries inflicted by the police. The reason for distinguishing between a convict and a free citizen is clear. The police are not privileged to inflict any punishment on a free citizen.

5. Our decision should not be read as unqualified approval of the conduct of the Charlotte officers. Indeed, we are profoundly dismayed by evidence of coarse and abusive language employed against appellant during the time he was restrained. This deplorable behavior which reflects little credit on Charlotte Police Department, cannot, however, alter our basic conclusion that no constitutional injury was inflicted.

Consequently, there is no justification for absolving the police from liability unless the citizen can prove that their conduct satisfied the test for proving cruel and unusual punishment.

The fourth amendment, made applicable to the states through the fourteenth, provides that "the right of the people to be secure in their persons ... against unreasonable ... seizures shall not be violated...." Supreme Court precedent establishes that this amendment—not the eighth—is applicable to the claim of a person who protests police conduct arising out of an investigatory stop. In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Court held that the authority of police to make an investigatory stop "must be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures." 392 U.S. at 20, 88 S.Ct. at 1879. This involves a dual inquiry: "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." 392 U.S. at 20, 88 S.Ct. at 1879.

Recently, in rejecting the claim that police are authorized to kill an apparently unarmed, nondangerous fleeing suspect, the Supreme Court reviewed the fundamental principles that govern the interaction of police and citizens. In *Tennessee v. Garner*, 471 U.S. 1, 7, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985), the Court reiterated that "[w]henever an officer restrains the freedom of a person to walk away, he has seized that person." The Court then explained: "To determine the constitutionality of a seizure '[w]e must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" 471 U.S. at 8, 105 S.Ct. at 1699. In neither *Terry, Garner,* nor *Whitley* does the Court suggest that the intrusion on an individual's fourth amendment interests occasioned by an investigative stop is valid unless the individual proves by a preponderance of the evidence that the police acted "maliciously and sadistically for the very purpose of causing harm." Although the police acknowledge that Graham is not

a convict, they insist that the rigorous standard of proof unique to a convict's claim arising under the eighth amendment bars Graham's action as a matter of law. Their argument is supported by neither logic nor precedent. Instead, it is refuted by *Terry* and *Garner.* We too have long recognized these basic precepts of fourth amendment jurisprudence. *See Kidd v. O'Neil,* 774 F.2d 1252, 1255 (4th Cir.1985).

**II**

The police acted reasonably in making an investigative stop. But that is not the end of the fourth amendment inquiry. *Garner* explains: "Because one of the factors is the extent of the intrusion, it is plain that reasonableness depends on not only when a seizure is made, but also how it is carried out." 471 U.S. at 8, 105 S.Ct. at 1699; *see also Terry,* 392 U.S. at 20, 28–29, 88 S.Ct. at 1879, 1883–84. The conduct of the police after the stop is critical to this inquiry.

Because we are reviewing a directed verdict we must determine whether there is evidence which would permit the jury to reach a verdict in favor of Graham. Our review is governed by the following standard:

> In determining whether the evidence is sufficient the court is not free to weigh the evidence or to pass on the credibility of witnesses or to substitute its judgment of the facts for that of the jury. Instead it must view the evidence most favorably to the party against whom the motion is made and give that party the benefit of all reasonable inferences from the evidence.

9 Wright & Miller, *Federal Practice and Procedure* § 2524 at 543–45; *see also Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 696, 82 S.Ct. 1404, 1499, 8 L.Ed.2d 777 (1962).

Properly viewed, the evidence discloses that the officer's investigatory stop revealed that Graham was unarmed, that he presented no danger to the public, and that no probable cause existed to believe he had committed a crime. Berry promptly told the officer that Graham was suffering from a sugar reaction. After Graham had

run around the car twice, Berry and the investigating officer calmed him down as he sat on the curb. Another officer appeared and without inquiry about Graham's condition pushed Berry aside, rolled Graham over, and handcuffed him. A third officer arrived on the scene and opined: "I've seen a lot of people with sugar diabetes that never acted like this. Ain't nothing wrong with the M.F. but drunk. Lock the S.B. up."

When Graham, restrained by handcuffs, asked an officer to look in his wallet for his diabetic decal, the officer told him to "shut up" and slammed his head against Berry's car. Aware that they could place no charges against Graham, four officers threw him into a police car. A friend brought orange juice to the police car where Graham was confined in handcuffs. Graham asked the officer to give him the orange juice, and the officer responded "I'm not giving you shit." The officers took Graham to his home where he collapsed in the yard. Friends gave him orange juice and took him to a doctor.

Graham suffered a head injury that left him with a ringing in his ear and an abrasion on his head. He also suffered injuries to his wrists, an injury to his shoulder, and a broken foot. If his evidence is credited, a jury could find that the police caused the injuries.

The police take the position that Graham proved no actionable harm because Berry, one of Graham's witnesses, did not hear any impact when the police pushed Graham's head against the car and because Berry's statement to a police investigator differed in some respects from his testimony. The police also emphasize that Graham's expert witness acknowledged that it was appropriate to restrain him. Reliance on these arguments for affirmance violates both the standard for reviewing a directed verdict and Federal Rule of Evidence 607. A party is no longer bound by the statement of his own witness. It was the jury's function—not the court's—to decide which version of Berry's account to believe. Moreover, Graham's expert soundly criticized the manner in which the police conducted themselves. His testimony on which the police rely was made in response to a hypothetical question on cross examination framed most favorably for the police in disregard of much of Graham's evidence. Again, the jury was the proper arbiter of the weight to be accorded the expert's response.

Within minutes after the investigatory stop the police knew they were dealing with a seriously ill man who was innocent of any crime. Whether the scope and conduct of their seizure violated the reasonableness requirement of the fourth amendment clearly presented a question for the jury to determine in accordance with the principles explained in *Terry* and *Garner*.