850 F.2d 884
 57 USLW 2041, 1988-1 Trade Cases 68,100
 William AUWOOD and Neal S. Ossen, as Trustees in Bankruptcy
for Liberty Theatre Corporation,
Plaintiffs-Appellants, Cross-Appellees,
v.
HARRY BRANDT BOOKING OFFICE, INC., Groton Cinema, Inc., and
United Artists Communications, Inc.,
Defendants-Appellees, Cross-Appellants.
 Nos. 716-718, Dockets 87-7727, 87-7729 and 87-7731.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 18, 1988.
Decided June 17, 1988.
 
 William M. Auwood, Quaker Hill, Conn., pro se.
 Stephen M. Trattner, Washington, D.C. (Robert C. Smith, Levy & Smith, P.C., Washington, D.C., on the brief), for plaintiff-appellant-cross-appellee Ossen.
 Edwin L. Doernberger, New Haven, Conn. (Sachs, Berman, Rashba & Shure, P.C., New Haven, Conn., on the brief), for defendant-appellee-cross-appellant Harry Brandt Booking Office, Inc.
 Peter M. Fishbein, New York City (Richard C. Seltzer, Michael Malina, Aton Arbisser, Kaye, Scholer, Fierman, Hays & Handler, New York City, on the brief), for defendants-appellees-cross-appellants Groton Cinema, Inc., and United Artists Communications, Inc.
 Before TIMBERS, KEARSE, and MAHONEY, Circuit Judges.
 KEARSE, Circuit Judge:
 
 
 1
 Plaintiffs William Auwood and Neal S. Ossen, as Trustees in bankruptcy for Liberty Theatre Corporation ("Liberty"), appeal from a final judgment entered in the United States District Court for the District of Connecticut following a jury trial before Peter C. Dorsey, Judge, awarding them $3.00 as treble damages for injury suffered by Liberty as a result of an agreement or conspiracy among the defendants to allocate "first-run" films among theatres other than Liberty, in violation of Sec. 1 of the Sherman Antitrust Act, 15 U.S.C. Sec. 1 (1982), 647 F.Supp. 1551. On appeal, plaintiffs contend that the district court erred (1) in denying their motion for a new trial on the issue of damages, and (2) in reducing the jury's damage award of $75,000, labeled by the jury as "nominal," to $1. Defendants Harry Brandt Booking Office, Inc. ("Brandt"), Groton Cinema, Inc. ("Groton Cinema"), and United Artists Communications, Inc. ("UA Communications"), cross-appeal, contending (1) that the court should have granted judgment in their favor notwithstanding the verdict ("n.o.v.") because plaintiffs failed to prove a conspiracy of which defendants were members and failed to prove injury, and (2) that any award of costs or attorneys' fees to plaintiffs should be reduced by amounts previously received by plaintiffs in settlements with other defendants. For the reasons below, we conclude that the judgment of the district court should be modified to award plaintiffs $225,000 in treble damages, less amounts plaintiffs have received from other alleged coconspirators in settlement of their claims.
 
 I. BACKGROUND
 
 2
 From 1976 to 1981, Liberty operated a movie theatre in Uncasville, Connecticut, midway between the cities of Norwich and New London. In the operation of its business, Liberty sought to license motion pictures for exhibition on a "first-run" basis, i.e., to give the first exhibition of a film released by a major film distributor in a given geographical market. It secured few first-run films, and in 1981 it declared bankruptcy.
 
 
 3
 In 1979, Liberty and Auwood, its principal, commenced the present action against several theatre chains and film distributors, alleging that the defendants had entered into an agreement among themselves to allocate the rights to license first-run films among the exhibitor parties to the agreement, to the exclusion of Liberty, thereby causing injury to Liberty in its business and property in violation of Sec. 1 of the Sherman Act, 15 U.S.C. Sec. 1. The complaint sought an unstated amount in damages, to be trebled in accordance with Sec. 4 of the Clayton Act, 15 U.S.C. Sec. 15 (1982).
 
 
 4
 After some years of discovery, several of the defendants entered into settlement agreements with plaintiffs. They paid plaintiffs a total of at least $97,000 and were dismissed from the case. The case proceeded to trial against the present defendants: Groton Cinema, which operated a movie theatre in New London; UA Communications, which is Groton Cinema's parent (also referred to as "UATC"); and Brandt, which was a booking agent for Groton Cinema and a theatre in Norwich (the "Norwich Cinema").
 
 A. The Jury Verdicts
 
 5
 A 13-day jury trial was held, with the jury considering separately the issues of liability and damages. Pursuant to Fed.R.Civ.P. 49(a), special verdict interrogatories were given to the jury on each set of issues.
 
 
 6
 On the liability issues, the jury found that Brandt, Groton Cinema, and UA Communications had formed, joined, or participated in a conspiracy, combination, or agreement which was intended to and did constitute an unreasonable restraint of trade. It found that these actions adversely affected Liberty's opportunities to obtain a fair allocation of first-run films and proximately caused injury to Liberty's business.
 
 
 7
 As to damages, plaintiffs had contended that they were entitled to lost profits calculated either on the basis that Liberty bid on and was denied its fair share of first-run films (the "demand theory"), or on the basis that it was futile for Liberty to bid but that absent the conspiracy Liberty would have earned profits comparable to those earned by Norwich Cinema (the "comparability theory"). Plaintiffs also contended that because prior to being driven into bankruptcy, Liberty had never been a profitable operation, plaintiffs were entitled to recover any out-of-pocket losses Liberty had sustained. Plaintiffs claimed that Liberty's actual losses totaled $218,610 and that they should recover an additional $125,024 in lost profits.
 
 
 8
 Although plaintiffs eventually appeared to back away from the demand theory, the trial court instructed the jury that it could award damages on the basis of either the comparability theory or the demand theory. If plaintiffs had proven that Liberty "bid for the right to show a particular picture and that its bid was rejected because of the unlawful conspiracy," the jury could award the difference between the profits Liberty would have made on the picture it bid on unsuccessfully and the profits it made on the picture actually shown. If the jury found that Liberty was comparable to the Norwich Cinema and that, because of the conspiracy, it was futile for Liberty to bid on first-run films, the jury could award plaintiffs the difference between Liberty's net receipts (box office receipts minus costs and expenses) and the Norwich net receipts.
 
 
 9
 The court also instructed the jury that it could award nominal damages, stating, in part, as follows:
 
 
 10
 Nominal damages are a minimal sum that may be awarded when a person's rights have been violated, but when he has not proved any actual damages or when he has been unable to prove an amount to which his injuries might entitle him.
 
 
 11
 ....
 
 
 12
 You have found defendants have violated plaintiffs' legal rights, and if you should further find that plaintiffs have not proven any of the damages alleged in the complaint, you may award plaintiffs nominal damages.
 
 
 13
 In response to specific interrogatories, the jury found that as of June 1977, it would have been futile for Liberty to attempt to obtain first-run films in open bidding. It also found that Liberty was not comparable to the Norwich Cinema for the period 1978-1981. As to the amount of damages, the jury answered interrogatories as follows:
 
 
 14
 3. What amount, if any, have plaintiffs proven would fairly, reasonably and justly compensate plaintiffs for any actual losses sustained, that is, from costs exceeding revenues, as proximately caused by defendants' conduct:
 
 
 15
 (a) For the period 19761977 .... $ 3,000.00
 (NOMINAL)
(b) For the period 19781981 .... $67,000.00
 (NOMINAL)
(c) For the period 19821985 .... $ 5,000.00
 (NOMINAL)
 
 
 16
 4. What amount, if any, have plaintiffs proven would fairly, reasonably and justly compensate plaintiffs for any lost profits sustained during the period 1978-April 1981 as proximately caused by defendants' conduct:
 
 
 17
 $ 0As discussed in greater detail in Part II.B. below, notwithstanding the seeming inconsistency between the sums listed by the jury in response to Interrogatory 3 and the application of the label "nominal," none of the parties asked the court to request clarification from the jury; nor did the court seek such clarification on its own motion.
 
 B. The Posttrial Motions
 
 18
 Some weeks after the close of trial, UA Communications and Groton Cinema moved for judgment in their favor n.o.v. on the liability issues, or alternatively, for the entry of judgment for plaintiffs in the amount of $3, representing $1 in nominal damages, trebled, plus costs and reasonable attorneys' fees, to be offset by the amounts plaintiffs had previously received in settlements. Brandt eventually joined in this motion. Plaintiffs opposed defendants' motions in all respects and moved instead for the entry of judgment in the amount of $225,000, i.e., $75,000 trebled, plus interest, costs, and attorneys' fees.
 
 
 19
 In a Ruling on Motion for Entry of Judgment dated November 21, 1986 ("Judgment Ruling"), published at 647 F.Supp. 1551, the court denied defendants' motion to deduct the settlement payments but granted their motion to limit plaintiffs' recovery of damages to $3. With respect to the amount of damages, the court stated that "the jury expressly found that plaintiffs failed to prove damages via either the demand theory or the comparability theory--the only theories claimed," and that the question before the court was "can the award of $75,000 in nominal damages be reconciled with the findings that compensatory damages were unwarranted." Id. at 1554. The court stated that Interrogatory 4 embodied the demand theory, and that the jury found that under that theory plaintiffs were not entitled to compensatory damages. It stated that Interrogatory 3 was designed to measure compensatory damages based on the comparability theory and found that "the jury apparently concluded that plaintiffs were either not entitled to compensatory damages or that they had failed to prove them ...." Id. at 1553. Accordingly, the court concluded that the jury could not have intended its award of a total of $75,000 as compensatory damages but only as nominal damages, consistent with the label it attached to each component of that sum.
 
 
 20
 Noting that its charge to the jury had not specified what sum could be considered nominal, the court ruled as a matter of law that $75,000 was not nominal and that the nominal damage award should be limited to $1. Accordingly, it ordered that judgment enter in favor of plaintiffs for $1 trebled, or $3. Such a judgment was entered on November 26, 1986.
 
 
 21
 Plaintiffs timely moved for a new trial on the issue of damages, contending principally (1) that the court's instructions to the jury on compensatory damages were incomplete, in part because it did not inform the jury that it could award damages for actual losses incurred as distinct from lost profits, (2) that the court's instructions were unduly restrictive as to plaintiffs' burden of proof, and (3) that the charge on nominal damages had been confusing. Defendants renewed their motions for judgment n.o.v. on the liability issues. In a Ruling on Pending Motions dated July 16, 1987 ("Postjudgment Ruling"), the court denied both plaintiffs' motion for a new trial and defendants' motions for judgment n.o.v. These appeals followed.
 
 II. DISCUSSION
 
 22
 On the present appeals, defendants contend principally that the district court should have granted their motions for judgment n.o.v. because plaintiffs failed to prove (a) the existence of a conspiracy to allocate first-run films, (b) the participation by the defendants in such a conspiracy, or (c) any quantifiable injury resulting from unlawful conduct on the part of the defendants. They also contend that if judgment is not entered in their favor, they are entitled in any event to have their liability for costs and attorneys' fees offset by the amounts plaintiffs have already received in settlement of their claims. Plaintiffs contend that the district court should have granted them a new trial on the issue of damages or at the very least should have entered judgment in their favor on the basis of the dollar sums specified by the jury rather than reducing their award to $1. For the reasons below, we conclude (1) that the district court should not have reduced the damages amounts specified by the jury, and (2) that defendants are entitled to have plaintiffs' judgment for treble damages reduced by the amounts that plaintiffs have already received in settlements.
 
 
 23
 A. The Denial of Judgment N.O.V. as to Liability
 
 
 24
 Defendants' contentions that they were entitled to judgment in their favor notwithstanding the jury's findings against them on the issues of liability need not detain us long. The standard applicable to the review of the denial of judgment n.o.v. is well established. The
 
 
 25
 evidence must be viewed in the light most favorable to the party against whom the motion was made, and that party must be given the benefit of all reasonable inferences that might have been drawn in his favor from the evidence.... Denial of judgment n.o.v. may be overturned only if
 
 
 26
 the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached.
 
 
 27
 Bohack Corp. v. Iowa Beef Processors, Inc., 715 F.2d 703, 712 (2d Cir.1983) (quoting Simblest v. Maynard, 427 F.2d 1, 4 (2d Cir.1970)); see Mattivi v. South African Marine Corp., "Huguenot", 618 F.2d 163, 167 (2d Cir.1980). These principles, which are applicable to the review of such a motion in both the appellate court and the district court, were properly applied below, and we affirm substantially for the reasons stated by the district court in its Postjudgment Ruling.
 
 
 28
 As the district court noted, there was ample evidence that the first-run exhibition of acclaimed films was more profitable than the subsequent exhibition of such films or the first exhibition of so-called "dogs." Despite the evidence that Liberty's gross income potential for first-run films was comparable to that of Norwich Cinema, Liberty received less than half as many first-run films as Norwich Cinema; it received only some 60% as many first-run films as other theatres whose gross income potential was less than that of Liberty. The evidence as to the cause of Liberty's receipt of so few first-run films included the testimony of a witness experienced in the film distribution business who testified that an agreement among distributors and theatres to allocate, or "split," first-run films among participating theatres caused certain first-run films bid on by Liberty to be licensed to Groton Cinema or other participating theatres and not to Liberty. From about 1967 to 1980, James Engle had been employed at various times in New England as a branch manager for Warner Brothers Pictures, or as an assistant branch manager and branch manager for Paramount Pictures; he had been a partner in Jed Parker Films, an independent film distribution company in Boston, and had owned his own film distribution company. As Boston branch manager for Warner Brothers Pictures in 1976-1978, Engle's territory included the New London-Norwich area. He testified that
 
 
 29
 [t]he splitting had been going on for some time in that area, long before I ever reached Warner Brothers. I found that out working at Jed Parker Films and also at Paramount Pictures.
 
 
 30
 Q. When you were at Warner Brothers, would exhibitors call up from time to time and say anything that would indicate that there might be a split?
 
 
 31
 A. Yes. I would get calls from RKO and Warner, "It's my picture, put it in on a particular availability date."
 
 
 32
 I would get calls from UATC, from Nat Harris [UATC's booker], telling me the same thing.
 
 
 33
 As an example of the denial of films to Liberty because of the allocation agreement, Engle testified that when he had been at Warner Brothers some two and one-half months, Liberty made a bid on "All the President's Men," and Engle recommended that Liberty be allowed to show that film at the same time as Groton Cinema. His recommendation was met by "a very irate" telephone call from his division manager, asking "who the hell the Liberty Theater was."
 
 
 34
 Q. Did he say anything?
 
 
 35
 A. He said, "Don't be stupid." He said, "The picture belongs to UATC and that's where it's going to play.
 
 
 36
 Q. Did you have any understanding with respect to how that picture was sold?
 
 
 37
 A. That picture was awarded on a split basis.
 
 
 38
 Engle testified that even when the ostensible reason for licensing a film to another theatre instead of to Liberty was a higher bid or guarantee from the other theatre, the latter often in fact paid less than the amount of Liberty's bid. The motive for distributors to adhere to the allocation agreement was that the participating theatres were required to show "dogs" as well as acclaimed films, thereby assuring distributors of outlets for all of their films, not just the most popular.
 
 
 39
 We conclude that the evidence in the record as a whole was sufficient to permit the jury to infer that there existed a conspiracy to allocate first-run films, that the defendants were parties to that conspiracy, and that the operation of the conspiracy caused injury to Liberty. Although there was also evidence that there might have been other reasons for Liberty's failure to receive more first-run films, the district court properly noted that the resolution of the conflicting evidence was a matter for the jury. The jury was not required to accept defendants' explanations, and we are not entitled to overturn the jury's credibility evaluations or the inferences it chose to draw. The motions for judgment n.o.v. were properly denied.
 
 
 40
 B. The Proper Treatment of the Jury's Verdict on Damages
 
 
 41
 Plaintiffs make alternative arguments with respect to the jury's verdict on damages. They contend principally that they are entitled to a new trial as to damages because of errors in the damages instructions, to wit, that the court's charge (1) should have been less restrictive as to the basis on which the jury could find Liberty comparable to Norwich Cinema, (2) should not have submitted the demand theory to the jury, and (3) was prejudicially confusing on the subject of nominal damages. Alternatively, plaintiffs contend that the court should have entered judgment on the basis of the dollar sums specified by the jury. Defendants, for their part, argue that the court's reduction of the damages award to $1 was proper because, in the words of the district court, the jury made a "finding of no proven damages under either theory of recovery advanced by plaintiffs." 647 F.Supp. at 1556.
 
 
 42
 Although we have some difficulty with the district court's interpretations of both the questions it posed to the jury and the answers thus elicited, we conclude that a new trial is not warranted. Our review of the instructions to the jury leads us to conclude that the charge on the comparability theory is not ground for reversal and that the instruction allowing the jury to award plaintiffs damages on the demand theory was not prejudicial to plaintiffs (defendants did not object to this instruction). Though the charge on nominal damages was undoubtedly incomplete and confusing, the availability of a view of the jury's answers that reconciles their apparent inconsistency leads us to the conclusion that the court should have allowed the damages amounts specified by the jury to stand.
 
 
 43
 We begin with the general principles applicable to special verdicts. Rule 49(a) of the Federal Rules of Civil Procedure provides that "[t]he court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact." Since the jury's answers provide the basis for the ultimate resolution of the suit, these "findings must be consistent with each other." 5A Moore's Federal Practice p 49.03, at 49-28 to 49-29 (2d ed. 1986) (footnote omitted). Though the Rule itself does not give guidance as to the proper course of action when the answers returned by the jury are inconsistent with one another, it is plain that proper deference to the parties' Seventh Amendment rights to a jury trial precludes entry of a judgment that disregards any material jury finding. See Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd., 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798 (1962); Fiacco v. City of Rensselaer, 783 F.2d 319, 325 (2d Cir.1986), cert. denied, --- U.S. ----, 107 S.Ct. 1384, 94 L.Ed.2d 698 (1987); Crane v. Consolidated Rail Corp., 731 F.2d 1042, 1051 (2d Cir.), cert. denied, 469 U.S. 854, 105 S.Ct. 179, 83 L.Ed.2d 114 (1984).
 
 
 44
 If the inconsistency between special verdict answers is noticed prior to the dismissal of the jury, the trial court has the discretion to resubmit the issues to the jury with a request for clarification, see Guidry v. Kem Manufacturing Co., 604 F.2d 320 (5th Cir.1979), whether or not the parties themselves request clarification. If the court elects not to seek clarification from the jury, or if the inconsistency is not noticed until after the jury has been dismissed, the court must take one of two actions. "It is the duty of the court to attempt to harmonize the answers, if it is possible under a fair reading of them." C. Wright & A. Miller, Federal Practice and Procedure Sec. 2510, at 515 (2d ed. 1971) (footnote omitted). Thus, "[w]here there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way." Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd., 369 U.S. at 364, 82 S.Ct. at 786; see 5A Moore's Federal Practice p 49.03, at 49-29 ("When the jury's findings appear to be inconsistent with each other, the Seventh Amendment requires that if there is a view of the case which makes the jury's answers to special interrogatories consistent, the court must adopt that view and enter judgment accordingly." (footnote omitted)). If there is no way to harmonize the jury's answers, the court must order a new trial.
 
 
 45
 The task of the court of appeals is similar. "[O]ur responsibility as a reviewing court is to adopt a view of the case, if there is one, that resolves any seeming inconsistency." Fiacco v. City of Rensselaer, 783 F.2d at 325. If no such resolution is possible, we must vacate the judgment and order a new trial. See 5A Moore's Federal Practice p 49.03, at 49-31 to 49-32 ("If after a review of the district court's judgment no reconciliation is possible and the inconsistency is such that the special verdict will not support the judgment entered below or any other judgment, then the judgment must be reversed and the case remanded for a new trial.") (footnote omitted).
 
 
 46
 The district court recognized the appropriate principles, but its application of them was flawed. The court and the parties immediately recognized that there was an apparent conflict between an award totaling $75,000, and the characterization of that award (and especially its $67,000 component) as "nominal." In seeking to resolve that inconsistency, however, the court came to the conclusion that there was a different inconsistency, to wit, a conflict between the award of any compensatory damages and "[t]he specific finding that plaintiffs had failed to prove damages under either the demand or comparability theories." 647 F.Supp. at 1556; see id. at 1554 ("the jury expressly found that plaintiffs failed to prove damages via either the demand theory or the comparability theory--the only theories claimed"). In light of the no-damages "finding," the court concluded that judgment could be entered on the basis that this "finding" was in fact consistent with the "nominal" label placed next to the dollar figures. Neither the law nor the record supports this approach.
 
 
 47
 If in fact there had been an interrogatory asking whether plaintiffs had proven any damages and the jury had answered "no," that answer would have been inconsistent with the answers specifying dollar amounts of damage. With no apparent way to harmonize those answers, the court would not be entitled to enter a judgment favorable to the defendants simply because the "no" answer was consistent with another answer. Such a result does not reconcile the inconsistency but simply overrules one inconsistent answer. Had such an irreconcilable inconsistency existed, the court should have granted a new trial as to damages.
 
 
 48
 We disagree, however, with the court's view that the jury "expressly found that plaintiffs failed to prove damages." No such express question was posed to this jury. Rather, the jury was asked only four basic questions. First, it was asked whether it would have been futile for Liberty to bid on first-run films; it answered that question "yes." Second, it was asked whether Liberty was comparable to Norwich Cinema; it answered this question "no." The latter answer was unfavorable to plaintiffs and meant that they could not recover on their comparability theory. Third, the jury found that plaintiffs suffered "actual losses ..., that is, from costs exceeding revenues, as proximately caused by defendants' conduct," in the total amount of $75,000. Although the court stated in its Judgment Ruling that Interrogatory 3 was designed to measure damages on the comparability theory, we find it difficult to believe that this design either existed when the case was submitted to the jury or was part of the jury's thinking. Our doubt stems from several factors.
 
 
 49
 First, the pre-charge colloquy between the court and counsel made it plain that the court understood that plaintiffs did not seek damages under the comparability theory for any period other than 1978-1981. Thus, the court stated, "with respect to 1976, 1977, [and] '82 through '85[,] [a]s I understand his claim, what he says is that the adverse split effects upon him lowered his gross, raised his costs, and he sustained the losses, and he sustained those losses without regard to any comparison to the Norwich Cinema." It hardly seems likely, therefore, that Interrogatory 3 was limited to the comparability theory, for it listed three subparts, the first seeking specification of losses for 1976-1977, and the third asking about such losses for 1982-1985. In contrast, Interrogatory 2, which asked whether the two theatres were comparable, posed that question only "for the period 1978-1981." Further, if in fact the court had submitted the case to the jury on the theory that Interrogatory 3 was restricted to the comparability theory, one would have expected the court to instruct the jury that if it answered "no" to Interrogatory 2, it need not answer Interrogatory 3 at all. The jury was not so instructed, however, either orally or on the written form submitted to it. Finally, there is nothing inherent or implicit in Interrogatory 3 as it was written and submitted to suggest that "losses ... from costs exceeding revenues" could be awarded only if the jury found the two theatres comparable. Given the facial breadth of Interrogatory 3 and the absence of any limiting instructions, the jury should not be deemed to have answered Interrogatory 3 as if it bore only on the comparability theory.
 
 
 50
 The fourth interrogatory asked the jury to quantify plaintiffs' "lost profits," if any. Though the court's posttrial view was that this was the only interrogatory that related to the demand theory, again, this view was not communicated to the jury in the court's instructions. In the absence of greater clarity in the trial court's instructions, we see no reason why the jury's answers to Interrogatories 3 and 4 could not have reflected a rational determination that, in the absence of anticompetitive conduct by the defendants, Liberty would likely have avoided some of the claimed losses but that plaintiffs had failed adequately to show that it would have made a profit.
 
 
 51
 In sum, we do not view the jury's answers to the interrogatories as inconsistent except insofar as they attached the label "nominal" to the rather sizeable sums they found proven as "costs exceeding revenues." Accordingly, we turn to the proper resolution of that apparent conflict.
 
 
 52
 Had the trial court's instructions made clear what the court meant by nominal damages, we would likely be forced to the conclusion that the jury's answer to Interrogatory 3 was internally inconsistent, for nominal damages are limited to sums that are de minimis, most commonly $1. The court's instructions to the jury, however, did not mention the $1 figure and were not a model of clarity, either individually or in combination. The first mention of nominal damages described them as "a minimal sum that may be awarded when a person's rights have been violated, but when he has not proved any actual damages or when he has been unable to prove an amount." There followed a passage on the requirement that a plaintiff act to mitigate his damages. Then the court added that the jury might award nominal damages if the plaintiffs had "not proven any of the damages alleged in the complaint." Later, after describing the written questions the jury was to answer, the court stated,
 
 
 53
 if you determine to award nominal damages with respect to either one of the claims covered by the third and fourth questions, you may simply, if you determine to do so, that is to award nominal damages, you may just simply write in that blank or blanks as is appropriate, the figure that you do award, and then just put after that in parenthesis, "nominal damages," intending to reflect your intention to award a sum that's consistent with my instructions on the issue of nominal damages.
 
 
 54
 Finally, during its deliberations, the jury asked the court, "if nominal is indicated do amounts also have to be specified?" In a supplemental instruction, the court informed the jury, that if "you find no damages proven you can just simply reflect that by an entry of, 'none,' or, 'zero.' " But the court also told the jury that if it was unable to find that there was proof of actual damages it was required to specify a dollar amount even with respect to an award that it considered "nominal."
 
 
 55
 Notwithstanding the less-than-clear picture painted by this combination of instructions, it seems highly likely that the jury believed it was arriving at figures that were designed to be compensatory. Had it meant to award merely token sums, it would likely have entered the same amount for each of the time periods listed in Interrogatory 3. Instead, no two amounts are the same, and the sums specified are widely disparate, ranging from $3,000 to $67,000. Given the jury's evident effort to specify amounts of loss actually proven, and given the court's instructions, it is hardly certain that the jury believed that by attaching the term "nominal" to the dollar figures specified, it meant to indicate that it found that plaintiffs had proven no actual quantifiable losses whatever.
 
 
 56
 Indeed, various individual parts of the nominal damages charge were subject to interpretations that would have given "nominal" a meaning that was not necessarily inconsistent with "compensatory." For example, in the absence of any reference in the instructions to $1 or any other specific figure, the court's description of nominal damages as a "minimal" sum could well have been interpreted as meaning that nominal damages were simply the minimum amount the jury found plaintiffs should be awarded. In addition, the reference to the possibility that plaintiffs had not proven "any" of the damages alleged in the complaint, could easily have been interpreted as referring to the possibility that any portion of the damages claimed had not been proven rather than to the possibility that no portion of those damages had been proven. Consistent with this possible interpretation, when the jury's verdict was returned and the parties and the court noted the puzzling juxtaposition of the amounts and the labels, plaintiffs' counsel stated that perhaps the jury believed it was required to label the amounts nominal because "they think they are determining a damage, an actual loss for that year, but it's obviously less than what is asked for...." The court responded, "That may be true, Mr. Smith, and that's a possible construction of what they did."
 
 
 57
 We agree with the district court that this is a possible construction of what the jury did. It may well have intended to find that plaintiffs had not proven all of the $218,610 in losses they had claimed but had proven a minimum of $75,000, and it may have believed that such a fraction was what the court meant by "minimal" or "nominal." Since this view reconciles the apparent inconsistency between the amounts and the labels, the court should not have reduced the jury's award to $1.
 
 
 58
 C. Defendants' Request for an Offset Against Attorneys' Fees
 
 
 59
 In their cross-appeal, defendants have argued that their obligation to pay plaintiffs' attorneys' fees should be reduced by the amount that plaintiffs received in settlement of these antitrust claims from other alleged coconspirators. We have considerable doubt as to the availability of such relief, since the statutory provision for an award of attorneys' fees is designed to protect a damage award from the inroads such fees would otherwise make, see, e.g., International Travel Arrangers, Inc. v. Western Airlines, Inc., 623 F.2d 1255, 1274 (8th Cir.), cert. denied, 449 U.S. 1063, 101 S.Ct. 787, 66 L.Ed.2d 605 (1980), and granting such an offset would penalize the pursuit of valid legal claims by a plaintiff who could establish that the nonsettling defendants were liable to it but could not sufficiently prove a high amount of damages.
 
 
 60
 It is, however, established that an amount recovered by a plaintiff from a coconspirator in settlement of the former's antitrust claims may be deducted from the plaintiff's damage award after it has been trebled. See New York v. Hendrickson Brothers, Inc., 840 F.2d 1065, 1086 (2d Cir.1988); Hydrolevel Corp. v. American Society of Mechanical Engineers, Inc., 635 F.2d 118, 130 (2d Cir.1980), aff'd, 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982). In their motion to the district court, defendants sought offset of the settlement amounts not just against costs and attorneys' fees but against the damage award as well. Though they have not explicitly argued that entitlement in this Court, doubtless because damages had been reduced to $3, we think it appropriate, since the issue was preserved in the district court, to treat it as implicitly conditionally pursued on this appeal. Accordingly, in light of our reinstatement of the jury's award of $75,000, we conclude that after that award is trebled, defendants may be credited with such amounts as the district court may determine that plaintiffs have previously received in settlement of their present claims from the alleged coconspirators.
 
 CONCLUSION
 
 61
 We have considered all of the arguments made by the parties on these appeals and, except to the extent indicated above, have found them to be without merit. The judgment of the district court is vacated in part, and the matter is remanded for entry of a judgment awarding plaintiffs $225,000 as treble damages, less settlement amounts as discussed above.
 
 
 62
 Costs to plaintiffs.