**Barry CALAMIA, Plaintiff–Appellee,**

v.

**The CITY OF NEW YORK, the Police Department of the City of New York, and Kevin Sutton, individually and as Police Officer of the City of New York, John Doe Officers, individually and as Officers of the Police Department of the City of New York, John Doe Officer, individually and as Commanding Officer of the Sixty Third Precinct of the Police Department of the City of New York, John Doe, individually, and Elizabeth Smyth, and Elizabeth Smyth a/k/a Betty Patterson, and Robert J. McGuire, as Commissioner of the Police Department of the City of New York, Defendants–Appellants.**

**No. 1123, Docket 88–9082.**

United States Court of Appeals, Second Circuit.

Argued May 10, 1989.

Decided June 22, 1989.

Sheldon M. Krupnick, Garden City, N.Y. (Krupnick & Goldman, Garden City, N.Y., on the brief), for plaintiff-appellee.

Edward F.X. Hart, New York City (Peter L. Zimroth, Corporation Counsel for the City of New York, Leonard J. Koerner, Jonathan Pines, Paul Marks, New York City, on the brief), for defendants-appellants.

Before KEARSE, CARDAMONE, and PIERCE, Circuit Judges.

KEARSE, Circuit Judge:

Defendants City of New York ("City"), City Police Detective Kevin Sutton, *et al.*, appeal from an amended final judgment entered in the United States District Court for the Eastern District of New York following a jury trial before Mark A. Costantino, *Judge*, awarding plaintiff Barry Calamia $50,000 in damages on his claims under 42 U.S.C. § 1983 (1982) for arrest without probable cause and use of excessive force during arrest, and his claim under state law for negligence and conversion. On appeal, Sutton contends that he was entitled to judgment notwithstanding the verdict ("n.o.v.") on grounds, *inter alia*, of insufficiency of the evidence and qualified immunity. For the reasons below, we affirm so much of the judgment as awarded Calamia damages on his state-law claims; we conclude, however, that Sutton is entitled to judgment in his favor on the claim for arrest without probable cause and is entitled to a new trial on the claim for use of excessive force.

## I. BACKGROUND

The events leading to this lawsuit arose out of a controversy between Calamia and defendant Elizabeth Smyth, who for some years had lived together and operated an antique store in Brooklyn, New York. The evidence at trial, taken in the light most favorable to Calamia, revealed the following.

### A. *The Criminal Charges Against Calamia*

In mid-June 1982, Smyth went to the Police Department's 63rd Precinct and filed a complaint alleging that Calamia had taken property belonging to her from her store. Detectives told her they would investigate her complaint, but they came to the view that the matter was a domestic dispute more properly pursued through other routes. Smyth then went to the Kings County District Attorney's Office and lodged her complaint with Assistant District Attorney ("ADA") Lee Jacobson.

Jacobson asked Smyth for documentation of her claims that she owned the store and the property taken by Calamia. Smyth told him Calamia had taken documents along with the property, but she produced, *inter alia*, utilities bills for the store in her name, a license issued by the City Department of Consumer Affairs permitting her to do business as an antique dealer, a receipt for certain property, and income tax forms indicating that she was running the business and paying taxes on its profits. Jacobson interviewed a number of witnesses; three who operated a store adjacent to Smyth's stated they had seen Calamia removing large quantities of property from the store in the middle of the night. Smyth told Jacobson she had seen her property in the apartment of Sylvia Kramer, Calamia's mother, where Calamia lived.

Jacobson concluded that Smyth had a legitimate complaint, and he telephoned the 63rd Precinct to inquire why the police were not pursuing the matter. The desk officer advised Jacobson that if he felt action was warranted he should send a written note so stating. Jacobson discussed the matter with his superiors and then sent

Smyth to the police station with a formal letter, a note to the desk sergeant, and a list of the property Smyth claimed Calamia had taken. The letter stated, in pertinent part, as follows:

This note concerns a number of crimes perpetrated against Ms. Elizabeth Smyth by one Barry Calamia–Kramer over the past two months. Ms. Smyth attempted to initiate criminal proceedings at the 63 precinct [*sic*] earlier this week but was unsuccessful. Apparently the feeling as [*sic*] the station was that the incidents were "domestic disputes" and that Ms. Smyth should pursue other remedies.

After extensive conversations with Ms. Smyth, it is my conclusion that the alleged incidents are not domestic disputes and that the crimes should be handled through the criminal justice system. My conclusion is based on the following:

(a) the serious nature of the alleged crimes (i.e., burglary, criminal possession of a weapon, menacing, etc.),

(b) the number and frequency of the alleged crimes,

(c) the strength of the cases (witnesses to almost all crimes),

(d) the present non-relationship of the defendant to the complainant ...,

(e) the possible dangerousness of the accused. The complainant presently fears for her physical safety. The accused has more than once threatened to kill the complainant, and to physically harm other persons and witnesses. (In addition, the defendant was, and still may be, a suspect in a Brooklyn murder case).

All things considered, this does not seem to be a "lovers [*sic*] quarrel" or a "domestic dispute." Instead it seems to be a number of serious crimes perpetrated by a possibly very dangerous person.

Lieutenant Dowling of the 63 precinct [*sic*] has assured me that if I enclose this note with an attached copy of the alleged crimes, Ms. Smyth will have no difficulty in initiating the complaint and having the accused arrested.

In addition, the accused has made it known to the complainant that he has in his possession the fruits of the alleged burglary (the complainant has also seen said property in the accused's home). Some effort should be made to recover this property before the accused destroys it.[ ] A search warrant may not be required. (Complainant states that when the accused's mother opens the door to the apartment, much of the stolen property can be seen in "plain view.")

Thank you very much for your help. The case should be pursued. Attached is a listing of most of the alleged crimes, the date, time and places of occurrence, and witnesses to those crimes.

(Letter of ADA Jacobson, dated June 18, 1982.)

Smyth took the documents given her by Jacobson to the 63rd Precinct and gave them to Detective Sutton, to whom her case had been assigned. Sutton reviewed the papers and discussed the matter by telephone with Jacobson. Jacobson asked Sutton to go to the Kramer–Calamia apartment with Smyth "to get a fresh observation" of the property allegedly stolen by Calamia, because the authorities "need[ed] a more recent sighting to obtain any sort of search warrant."

On June 30, Sutton accompanied Smyth to the Kramer–Calamia apartment; they did not enter, but stood in the doorway and observed a cluttered apartment with a large amount of furniture. Sutton thereafter executed an affidavit in support of an application for a search warrant for more than 40 listed items. The affidavit stated that Sutton had been informed by Smyth that the listed property had been stolen from her antique store. In addition, though Sutton admitted at trial that he had not seen all of the items listed in his affidavit in support of the search warrant application, that affidavit stated "that on June 30, 1982 [deponent] did accompany informant Elizabeth Smyth of Brooklyn to the above mentioned premises and at that time did observe the above described property." The premises mentioned were identified as "apartment 5L" at the street address where Calamia and his mother lived; the Kramer–Calamia apartment, however, was

12E, not 5L. A search warrant was issued for apartment 5L.

At approximately midnight on June 30, Sutton and five other City policemen went to the Kramer–Calamia apartment and arrested Calamia. Calamia testified that when he opened the door, Sutton immediately shoved him in the chest, threw him to the floor, turned him over and handcuffed his wrists tightly behind his back. Though Calamia complained that the cuffs were cutting into his wrists, the officers kept him tightly cuffed. Except for a short time in which the officers sat him up for a telephone call to his attorney (and held the receiver for him), Calamia remained on the floor, tightly handcuffed with his hands behind his back for some five or six hours while the officers collected the items listed in the search warrant. Eventually, he was taken to the police station and only thereafter were his handcuffs loosened or removed.

Calamia was arraigned on charges of burglary in the third degree and criminal possession of stolen property in the first degree. The property seized by the police was not kept in police custody but was promptly released to Smyth with instructions to safeguard it until after disposition of the criminal charges against Calamia. Two or three days later, Smyth and her mother moved the property to Long Island. Calamia had sought unsuccessfully to persuade Sutton that he was the sole proprietor of the antique store and was in fact the owner of the property Smyth claimed he had stolen. He also sought unsuccessfully to have Sutton prevent Smyth's removal of the property to Long Island.

Some eight months later, the charges against Calamia were dismissed. The property was not returned to Calamia. The District Attorney's office decided that since Smyth had possession of the property, the criminal charges should be dropped and the matter resolved in Civil Court as a property dispute.

B. *The Present Lawsuit*

Calamia commenced the present suit in 1983 against Sutton, the City, various "John Doe" police officers, Smyth, and her mother, contending, *inter alia,* that one or more of them had violated his Fourth Amendment rights by arresting him without probable cause and by using excessive force in the arrest, and were liable under state law for conversion or negligent disposition of his property. Only the claims against Sutton and the City went to the jury, the claims against the other defendants having been dismissed. In addition to evidence of the events described above, the trial record included testimony by Smyth that prior to the arrest of Calamia, she had not entered the store since March 1982; she had ceased to go there after Calamia threatened her with bodily harm and death. Calamia testified that after February 1982 he, not Smyth, owned the antique store. He called as a witness a customer who had dealt with him as the proprietor of the store from approximately 1978 to 1982. Calamia also introduced his own canceled checks for purchases of antiques to be sold in the store and for rent on the store; he testified that in June 1982, when he removed the property in question, Smyth had no proprietary interest in the store.

The jury returned a special verdict in favor of Calamia against both defendants on most of his claims. It found that Sutton "violated plaintiff's civil rights by unlawfully arresting him," and "violated plaintiff's civil rights by using unreasonable or excessive force in arresting him." It awarded Calamia $25,000 "on his Civil Rights claims against Officer Sutton." The jury found that the City had a policy that caused these civil rights violations and it awarded Calamia $150,000 on those claims against the City. In addition, the jury found that Sutton was liable for conversion and negligence, and it awarded Calamia $25,000 on these state-law claims.

By motion filed February 5, 1987, defendants timely moved for judgment n.o.v., or, in the alternative, a new trial. They contended, *inter alia,* (1) that the verdict against the City should be set aside because there was no evidence of a municipal policy sufficient to establish municipal lia-

bility under § 1983, (2) that probable cause for Calamia's arrest existed as a matter of law, and (3) that the evidence was insufficient to establish that the force used to arrest Calamia was so excessive as to shock the conscience. Defendants also argued that the instructions to the jury were erroneous in several respects and that the special interrogatories to the jury were deficient because they did not include any questions as to the defense of qualified immunity.

In a Memorandum of Decision and Order dated November 7, 1988, the trial court granted the City's motion for judgment in its favor on the ground that there was no evidence of a municipal policy, and denied the posttrial motions in other respects. The court found that there was sufficient evidence that there had been a conversion of Calamia's property and that the conflicting testimony concerning the amount of force used by Sutton was properly a matter for resolution by the jury based on its assessments of the witnesses' credibility. The court did not discuss the contention that probable cause was established as a matter of law. It rejected the contention that its instructions were flawed, stating that "the charge to the jury, which was in excess of over one hundred pages, was the product of negotiation between the litigants and the court. Defendant cannot now complain about instructions to the jury which it help [sic] create." Id. at 2.

An amended judgment was entered against Sutton in the total amount of $50,000, and this appeal followed. Although the notice of appeal is styled one by all of the defendants and purports to challenge "each and every part of" the amended judgment, the brief on appeal attacks only the rulings adverse to Sutton, and only Sutton has standing to challenge those rulings. Calamia has not cross-appealed.

## II. DISCUSSION

On appeal, Sutton contends principally that he was entitled to judgment n.o.v. dismissing the constitutional claims because (1) as a matter of law, the evidence established probable cause to arrest Cala-

mia; (2) the evidence was insufficient to support a finding that Sutton used excessive force in arresting Calamia; and (3) Sutton established as a matter of law his qualified immunity from liability on these claims. He contends that he was entitled to judgment on the state-law claims because the weight of the evidence established that Smyth owned the property in question. In addition, Sutton contends that the trial court's instructions to the jury on the claims of excessive force and conversion were erroneous. For the reasons below, we conclude that the court properly denied judgment n.o.v. on the state-law claims but that Sutton was entitled to judgment as a matter of law on the claim that the arrest was made without probable cause and is entitled to a new trial on the claim for use of excessive force.

### A. The State–Law Claims

With respect to Calamia's state-law claims for conversion and negligent disposition of the property, Sutton contends that he was entitled to a judgment of dismissal because the weight of the evidence showed that Calamia did not own the property and because the jury should have been instructed that Sutton seized the property pursuant to a facially valid search warrant. We disagree.

The standards applicable to motions for judgments n.o.v. are the same for the district court and for the appellate court. In deciding such a motion or in reviewing the denial of such a motion, the court must view the evidence " 'in the light most favorable to the party against whom the motion was made, and that party must be given the benefit of all reasonable inferences that might have been drawn in his favor from the evidence.' " *Auwood v. Harry Brandt Booking Office, Inc.*, 850 F.2d 884, 889 (2d Cir.1988) (quoting *Bohack Corp. v. Iowa Beef Processors, Inc.*, 715 F.2d 703, 712 (2d Cir.1983)); *see Mattivi v. South African Marine Corp., "Huguenot"*, 618 F.2d 163, 167 (2d Cir.1980); *Simblest v. Maynard*, 427 F.2d 1, 4 (2d Cir.1970). We may reverse the denial of judgment n.o.v. only if "the evidence is such that, without weigh-

ing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached." *Id.* These principles require the rejection of Sutton's contention that he was entitled to judgment for lack of proof that Calamia owned the property.

■ The trial record in the present case included Calamia's testimony that he owned the business and the property in question. Though the landlord testified that he had always regarded Smyth as the lessee of the store, Calamia introduced his own canceled checks for rent for certain months and introduced his receipts for certain of the property. Sutton appropriately acknowledges in his brief on appeal that "there was ... conflicting testimony about the ownership of the property recovered from plaintiff's apartment," and "divergent testimony concerning the ownership of the antique store and the property within it." His argument that the clear "weight" of the evidence indicated that the store and the property were owned by Smyth is thus unavailing. The trial court properly refused to second-guess the jury as to the weight of the evidence or the proper resolution of conflicts in the testimony with regard to ownership of the property or Calamia's right to possess it.

The trial court also properly rejected Sutton's request for a ruling, by way of dismissal or jury charge, that even if Calamia properly possessed the property, Sutton could not be liable for its conversion because he seized it pursuant to a facially valid search warrant. Preliminarily, we note that the search warrant was not in fact "facially" valid, because it authorized a search of apartment 5L, not the Kramer–Calamia apartment, 12E, which was searched. Sutton conceded at trial that he received no authorization from the court at any time to search apartment 12E. Even if the warrant had not misidentified the apartment to be searched, however, the general principle relied on by Sutton was not necessarily applicable to his conduct.

Although in general "[o]ne is privileged to commit acts which would otherwise be a trespass to a chattel or a conversion when he acts pursuant to a court order which is valid or fair on its face," *Restatement (Second) of Torts* § 266 (1965), the actor has no such privilege when he has procured the order by means of an intentional misrepresentation to the issuing authority. Thus, comment *b* to § 266 states that in order for the writ to be valid, it is required, *inter alia,* that "all proceedings required for the proper issuance of the writ ... have duly taken place." We cannot regard proceedings in which the arresting officer has intentionally or recklessly made false statements to the issuing court or magistrate as having "duly" taken place. In the context of a criminal proceeding, for example, a seizure of property pursuant to a search warrant may be challenged on the ground that the warrant was procured through a material misrepresentation. *See Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). In *Franks,* a search warrant had been procured on the basis of an affidavit that stated, *inter alia,* that the affiant himself had spoken to certain witnesses; the defendant, seeking to challenge the seizure by attacking the veracity of the affidavit, presented evidence that this statement was false. The Supreme Court ruled that if the challenged statement was material to a determination of whether probable cause existed, the defendant would be entitled to a hearing into the veracity of the affidavit: "Because it is the magistrate who must determine independently whether there is probable cause, ... it would be an unthinkable imposition upon his authority if a warrant affidavit, revealed after the fact to contain a deliberately or recklessly false statement, were to stand beyond impeachment." *Id.* at 165, 98 S.Ct. at 2681. We likewise conclude that the state-law privilege normally conferred on an officer by a court order does not exist when the officer has procured the order by means of an intentional or reckless misrepresentation.

The trial court in the present case fairly advised the jury of both the general principle that a valid search warrant immunizes the seizing officer from liability for conversion, and of the circumstances in which the

general principle is inapplicable. It stated that, in light of the fact that Sutton seized the property pursuant to a search warrant, the jury was required to return a verdict in favor of Sutton "unles[s] you find that Officer Sutton intentionally withheld information from Judge Pesce or provided false information regarding the issuance of the search warrant."

■ The evidence was sufficient to permit the jury to conclude that the normal privilege should not apply to the conduct of Sutton. Though ADA Jacobson had asked Sutton to accompany Smyth to Calamia's mother's apartment to view the property precisely for the purpose of obtaining a search warrant, and though Sutton went there and looked through the doorway, he admitted at trial that he did not see all of the more than 40 items listed in the application as stolen property to be seized. His affidavit nonetheless stated that he personally had seen the listed items. The evaluation of the inconsistency was within the province of the jury, and the evidence was sufficient to permit it to infer that Sutton had intentionally withheld information or provided inaccurate information in his affidavit in order to obtain the warrant.

In sum, we see in the record no basis for disturbing the jury's finding that Sutton was liable for negligence or conversion of the property, and we affirm the judgment awarding Calamia $25,000 on that claim.

## B. *Probable Cause for Arrest*

Calamia's claim that the arrest was made without probable cause rested on the fact that Sutton himself did not make a factual investigation of Smyth's claim that the property taken by Calamia belonged to her. Calamia contended that Sutton was not entitled to rely on Jacobson's investigation. This premise should have been rejected as a matter of law.

■ In general, probable cause to arrest exists when the authorities have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested. *See, e.g., Illinois v. Gates,* 462 U.S. 213, 241–46, 103 S.Ct. 2317, 2333–36, 76 L.Ed.2d 527 (1983); *Dunaway v. New York,* 442 U.S. 200, 208 & n. 9, 99 S.Ct. 2248, 2254 & n. 9, 60 L.Ed.2d 824 (1979); *Draper v. United States,* 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327 (1959); *Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949). The existence of probable cause must be determined on the basis of the totality of the circumstances, *see, e.g., Illinois v. Gates,* 462 U.S. at 230–32, 103 S.Ct. at 2328–29, and "where law enforcement authorities are cooperating in an investigation ..., the knowledge of one is presumed shared by all." *Illinois v. Andreas,* 463 U.S. 765, 771 n. 5, 103 S.Ct. 3319, 3324 n. 15, 77 L.Ed.2d 1003 (1983); *Whiteley v. Warden,* 401 U.S. 560, 568, 91 S.Ct. 1031, 1037, 28 L.Ed.2d 306 (1971); *LaBelle v. LaVallee,* 517 F.2d 750, 753 (2d Cir.1975), *cert. denied,* 423 U.S. 1062, 96 S.Ct. 803, 46 L.Ed.2d 655 (1976); *United States v. Canieso,* 470 F.2d 1224, 1230 n. 7 (2d Cir.1972).

■ There can be no question here that the police made the arrest of Calamia in cooperation with the District Attorney's office. As set forth in greater detail in Part I.A. above, ADA Jacobson informed the police that his investigation indicated Smyth had a valid complaint and that Calamia should be arrested. The police asked for and received the ADA's evaluation and instructions in writing. Nor is there any dispute as to the information possessed by Jacobson as a result of his investigation. He had examined Smyth's license to sell antiques, utilities bills for the store in her name, a receipt for certain merchandise, and income tax returns showing that she operated the store. He had interviewed witnesses who stated that they had seen Calamia removing unusually large amounts of furniture from the store at night. Smyth told him she had seen the removed property in Calamia's mother's apartment, and Sutton went to the apartment with Smyth and viewed a large amount of furniture piled up near the door, as if not part of the ordinary furnishings of that apartment. The totality of the information possessed

by Jacobson and Sutton was without doubt sufficient to warrant a person of reasonable caution in the belief that Calamia had committed burglary and that he was in possession of the stolen property. The knowledge possessed by the ADA, who directed the arrest, was presumptively shared by the arresting officers, who were not required to duplicate the investigation already undertaken.

We conclude that as a matter of law on the undisputed facts, there was probable cause for the arrest. This claim should not have been submitted to the jury, and Sutton was entitled to judgment n.o.v. dismissing it.

### C. *The Claim for Use of Excessive Force*

Finally, we turn to Sutton's contention that he was entitled to judgment n.o.v. on the claim that he used excessive force in making the arrest. Sutton argues that there was insufficient evidence to support this claim, that the trial court gave erroneous instructions to the jury as to the state of mind and degree of force necessary to establish a constitutional violation, and that as a matter of law he established his qualified immunity from liability on this claim. We conclude that Sutton was not entitled to judgment n.o.v. on this claim but that, for various reasons, the claim should be retried.

#### 1. *Standard Governing a Claim of Excessive Force During Arrest*

Sutton claims the trial court erred in instructing the jury as to the required animus and the amount of force necessary to violate Calamia's constitutional rights. In his proposed charge to the jury, Sutton, citing *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), and *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973), had urged the court to instruct the jury as follows:

> To find a federal constitutional violation you must find that the defendant applied excessive physical force either maliciously, that is with an intent to injure plaintiff, or with reckless disregard

of the likelihood of injury using such degree of force such as to be shocking to the average person's conscience or grossly offensive to such average person's sensibility....

He asked that the jury be instructed that it could not find in favor of Calamia on this claim unless it found that Sutton had used "force that was disproportionate to the amount that appeared to be reasonably necessary," and had "applied such force out of malice, sadism, or at least with a reckless disregard of whether such force was necessary."

The court did not instruct the jury that malice or sadism was necessary. Rather, it instructed the jury that, in order to prove his claim that excessive force had been used against him, Calamia was required to show

> First: That Officer Sutton knowingly used excessive force against the plaintiff;

> Second: That Officer Sutton acted under color of state law;

> Third: That his acts deprived the plaintiff of his federal constitutional right not to be denied his liberty without due process of law, not to have his personal integrity violated by assault, not to be subject to unreasonable physical force, and, not to be denied his federal constitutional right to be free from cruel, unusual and summary punishment and

> Fourth: That Officer Sutton's acts were the proximate cause of injury and consequent damage to the plaintiff.

> The first element requires that the plaintiff establish by a preponderance of the evidence that Officer Sutton knowingly used excessive force against the plaintiff. I have already instructed you on the meaning of "knowingly"; moreover, it is undisputed that Officer Sutton used some force during the incident. Therefore, I instruct you that you must find he acted knowingly.

> ....

> The third element requires that plaintiff prove by a preponderance of the evidence that Officer Sutton's actions violated his Constitutional right to due process of law. This means that the plaintiff

must show that the use of force against him, whatever you determine that force to have been, was unlawful under New York State law.

As to what amount of force could properly be considered excessive, the court stated merely that a police officer is allowed to "use physical force when and to the extent he reasonably believes such to be necessary to effect the arrest."

We conclude that, in light of the Supreme Court's recent clarification in *Graham v. Connor,* — U.S. —, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), *rev'g Graham v. City of Charlotte,* 827 F.2d 945 (4th Cir.1987) (*aff'g* 644 F.Supp. 246 (W.D.N.C. 1986)), neither the instructions requested by Sutton nor those given by the trial court were entirely correct.

*Graham v. Connor* involved a police officer's seizure of a man he thought might have robbed a convenience store; in fact, Graham, the suspect, had merely hurriedly sought fruit juice in the store to alleviate a diabetic condition. The officer stopped Graham, thinking his behavior suspicious, and instructed him to wait while the officer checked to see if the store had been robbed. Experiencing an insulin reaction, Graham ran around the officer's car twice, then sat down on the curb and passed out. While he was unconscious, officers handcuffed his hands tightly behind his back. When he regained consciousness and asked an officer to look in his wallet for his diabetic decal, the officer told him to shut up and slammed his head against a car. Four officers threw him, still handcuffed, head-first into a police car. When a friend brought him juice, the officers refused to let him drink it. Eventually, the officers learned that there had been no robbery and they took Graham home and released him. In the meantime, he had sustained, *inter alia,* a broken foot, cuts on his wrists, a bruised forehead, and an injured shoulder.

The trial court directed a verdict in favor of the defendants on the ground that, *inter alia,* the force used by the officers " 'was not applied maliciously or sadistically for the very purpose of causing harm.' " — U.S. at —, 109 S.Ct. at 1869 (quoting

district court opinion, 644 F.Supp. at 249). A divided court of appeals affirmed, with the majority endorsing the standards applied by the district court "as generally applicable to all claims of 'constitutionally excessive force' brought against governmental officials." — U.S. at —, 109 S.Ct. at 1869 (quoting court of appeals opinion, 827 F.2d at 948).

The Supreme Court reversed, stating that a claim for use of excessive force during an arrest is governed not by the due process standards of *Rochin v. California* and *Johnson v. Glick* but rather by Fourth Amendment standards:

> *all* claims that law enforcement officers have used excessive force—deadly or not —in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach.

— U.S. at —, 109 S.Ct. at 1871 (emphasis in original); *see also Heath v. Henning,* 854 F.2d 6 (2d Cir.1988) (Fourth Amendment standard applies in cases where police officer uses deadly force against fleeing suspect). The *Graham* Court stated that to the extent a claim charges excessive force during an arrest, the subjective elements of the *Johnson v. Glick* test, such as malice or sadistic intent, are not applicable:

> As in other Fourth Amendment contexts, ... the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.

— U.S. at —, 109 S.Ct. at 1872. In assessing whether the acts were objectively reasonable in light of the circumstances, the factfinder should bear in mind that

> "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," *Johnson v. Glick,* 481 F.2d, at 1033, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often

forced to make split-second judgments— in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

—— U.S. at ——, 109 S.Ct. at 1872. Thus, a proper assessment of whether the force used was excessive

requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

*Id.* The Court held that because Graham's excessive-force claim arose under the Fourth Amendment, he was entitled to have the jury consider that claim under the objective reasonableness standard.

■ *Graham* has several implications for the present case. First, it makes clear that the "malice" and "sadism" instructions requested by Sutton would have been improper. Thus, the rejection of those instructions was not error. Second, though the court did not give the erroneous instructions requested by Sutton, it did not give correct instructions since it focused in part on subjective considerations, repeatedly referring to the amount of force Sutton "believe[d]" to be necessary. Thus, the jury was not adequately informed that the test to be applied was an objective one. Third, the court gave the jury no proper guidance as to what amount of force may properly be regarded as excessive. Though not every state-law assault would violate the victim's constitutional right to be free from the use of excessive force, *see, e.g., Robison v. Via,* 821 F.2d 913, 923 (2d Cir.1987), the court advised the jury that Calamia was required to show that the force used would have been unlawful under New York State law. And though the jury should have been advised that "'[n]ot every push or shove'" is excessive, *Graham,* —— U.S. at ——, 109 S.Ct. at 1872 (quoting *Johnson v. Glick,* 481 F.2d at 1033), instead the court pointed out that "it is undisputed that Officer Sutton used

*some* force during the incident" (emphasis added), perhaps allowing the jury to infer that it was permitted to consider any force as excessive.

■ Nonetheless, though the instructions on the excessive-force claim were flawed, the evidence of record sufficed to warrant submission of this claim to the jury and to warrant denial of Sutton's motion for judgment n.o.v. The record showed that as soon as Calamia answered Sutton's knock at his door, Sutton shoved him to the floor and immediately cuffed his hands behind his back. There was evidence that the handcuffs were unduly tight, and though Sutton argues to us that Calamia's discomfort was "momentary," Calamia testified that he was kept in this painful condition for five or six hours before being taken to the police station. It was for the jury to determine whether Sutton's conduct in connection with the arrest, pushing Calamia to the floor and causing him to remain there in a painful posture without circulation in his hands for many hours while the officers collected the property was, as an objective matter, reasonable. The denial of judgment n.o.v. on this claim was proper.

### 2. *Qualified Immunity*

■ Sutton also contends that he was entitled to dismissal of the excessive-force claim as a matter of law on the ground of qualified immunity. This contention need not detain us long. A government actor is entitled to qualified immunity "insofar as [his] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), or, where the rights were clearly established, insofar as it was objectively reasonable to believe that his acts did not violate those rights, *see Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987); *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986); *Robison v. Via,* 821 F.2d at 921.

■ The right of an individual not to be subjected to excessive force has long been clearly established. Thus, the question here was whether it was objectively reasonable for Sutton to believe that his treatment of Calamia did not violate that right. This was a matter as to which the facts were not undisputed, and hence it was a question to be answered by a properly instructed jury. Accordingly, Sutton was not entitled to judgment n.o.v. on the ground of qualified immunity.

■ We are, however, constrained to note that the trial court's instructions on this defense were not correct. The court advised the jury that in order to establish his qualified immunity, Sutton was required to show, *inter alia,* that he "believed in good faith that his actions were lawful." The proper standard for proof of such immunity, as discussed above, is not good faith but rather objective reasonableness. Thus, the jury should have been informed that Sutton was required to show that it was objectively reasonable to view force such as that used on Calamia as not excessive.

### 3. *The Need for a New Trial*

■ The arguments advanced by Sutton in the trial court and on this appeal with respect to the excessive-force claim would not normally warrant a new trial. As indicated above, the instructions unsuccessfully requested by Sutton would not have been proper; and Sutton does not appear to have objected to the instructions directed to that claim on the grounds on which they were flawed. Nor did Sutton oppose the court's charge on qualified immunity on the proper ground. Ordinarily, in such circumstances, an unobjected-to erroneous instruction would not result in the granting of a new trial unless the instruction as given was plain error. *See Williams v. City of New York,* 508 F.2d 356, 362 (2d Cir.1974); Fed.R.Civ.P. 51. In the present case, however, we conclude that a new trial on the claim of excessive force is needed, whether or not the instructions as given contained plain error, because of our reversal of the judgment on

the claim for arrest without probable cause.

In submitting the case to the jury, the court asked the jury to return a special verdict, answering a number of specific questions. In accordance with the form submitted, the jury answered separately the questions whether Sutton had violated Calamia's civil rights by (a) arresting him unlawfully, and (b) using unreasonable or excessive force in making the arrest. The form did not, however, ask the jury for separate damages assessments for these two claims, and it awarded Calamia $25,000 "on his Civil Rights claim*s.*" (Emphasis added.) Thus, we are unable to determine what portion of these damages was awarded for arrest without probable cause and what portion was awarded for use of excessive force. Accordingly, a new trial at least as to damages is required.

Since such a trial is needed, and since the jury's consideration of Calamia's burden to establish liability on this claim and of Sutton's burden with respect to his qualified immunity defense was not conducted within the proper legal framework, we conclude that the liability issues as to this claim should be retried as well. Accordingly, we direct that the new trial of the claim for the use of excessive force encompass the liability issues as well as the damages issues.

### CONCLUSION

We have considered all of the arguments made by both sides on this appeal and, except to the extent indicated above, have found them to be without merit. The judgment is affirmed to the extent that it awards Calamia $25,000 on his state-law claims; in all other respects, the judgment is vacated, and the matter is remanded for dismissal of the claim for arrest without probable cause and for retrial of the claim for use of excessive force.

No costs.